**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DR. DOROTHY PRIOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-1483-SRF |
| | ) | (Consolidated) |
| STATE OF DELAWARE DIVISION OF | ) | |
| DEVELOPMENTAL DISABILITIES SERVICES, | ) | |
| LYNDA LORD, KAMIN GIGLIO, MARISSA | ) | |
| CATALON, and CORY NOURIE in their | ) | |
| Individual Capacities, | ) | |
| | ) | |
| Defendants. | ) | |

---

Ronald G. Poliquin, THE POLIQUIN FIRM, LLC, Dover, DE.

    Attorney for Plaintiff.

Zachary S. Stirparo, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE.

    Attorney for Defendants.

---

## MEMORANDUM OPINION

December 12, 2025
Wilmington, Delaware

**FALLON, U.S. MAGISTRATE JUDGE:**

Presently before the court in this employment-related civil rights case is a motion for summary judgment under Federal Rule of Civil Procedure 56, filed by defendants Lynda Lord, Kamin Giglio, Marissa Catalon, Cory Nourie (collectively, the "Individual Defendants"), and Delaware Division of Developmental Disabilities Services ("DDDS;" together with the Individual Defendants, "Defendants"). (D.I. 101)[1] For the following reasons, Defendants' motion for summary judgment is GRANTED.[2]

## I.    BACKGROUND

Dr. Dorothy C. Prior ("Plaintiff") was employed by DDDS as a psychologist within the division of Community Services beginning in September of 2017. (D.I. 102 at ¶ 1; D.I. 106 at ¶ 1) In 2018, Plaintiff was assigned to serve as a member on the Peer Review of Behavior Intervention Strategies ("PROBIS") Committee. (D.I. 102 at ¶ 3; D.I. 106 at ¶ 3) As a member of the PROBIS Committee, Plaintiff was responsible for ensuring that behavioral support plans ("BSPs") for qualified individuals were compliant with DDDS policy and procedure and applicable federal and state laws. (D.I. 95, Ex. F at 12:21-14:17; D.I. 110 at ¶ 15)

Plaintiff represents that her duties as a member of PROBIS "did not initially occupy the majority of [her] time working in Community Services" because the role only involved observing weekly PROBIS Committee meetings. (D.I. 110 at ¶ 14; D.I. 106 at ¶ 5) The

---

[1] The briefing and filings associated with the pending motion for summary judgment are found at D.I. 95, D.I. 98, D.I. 102, D.I. 105, D.I. 106, D.I. 107, D.I. 110, D.I. 113, and D.I. 114. Per the parties' stipulated briefing schedule at D.I. 100, the previous motion for summary judgment filed at D.I. 90 is no longer pending.

[2] On October 18, 2023, the parties consented to the jurisdiction of the Magistrate Judge to conduct all proceedings and the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (D.I. 75)

evidence of record shows that Plaintiff's PROBIS duties constituted a large portion of her assigned job duties by late 2019. (D.I. 95, Ex. D at 76:1-6; Ex. F at 81:4-83:3 & Giglio-1)

Plaintiff became dissatisfied with her role in PROBIS as her duties came under scrutiny. In June of 2019, the Delaware General Assembly formed a task force to address concerns raised by providers and members of the community about DDDS. (D.I. 95, Ex. F at 18:20-20:6; Ex. J-2 at D625-41) Specifically, service providers experienced difficulties getting BSPs approved through PROBIS in a timely manner. (*Id.*, Ex. J at 14:9-15:19) During a task force meeting on November 20, 2019, the task force recommended: (1) requiring DDDS to report on the status of outstanding BSPs and the progress toward their approval at each task force meeting, and (2) establishing a working group to "redesign PROBIS and its operations." (*Id.*, Ex. J-2 at D704-05) To fulfill these requirements, Tracy Whitehouse, a senior behavioral analyst at DDDS, collected PROBIS data for the task force and provided it to Kamin Giglio, the assistant director of community services for policy and planning, who then provided the data to Marissa Catalon, the division director at DDDS. (D.I. 95, Ex. C at 4:17-5:6, 60:22-61:2; Ex. F at 8:5-9, 45:4-19, 62:20-23; Ex. F, Giglio-1 at D594, Giglio-6 at D553-58; Ex. J at 6:12-22; Ex. J-2 at D557-90) The PROBIS data included in the June 2021 task force report outlined the number and status of overdue BSPs. (*Id.*, Ex. J-2 at D708, D712, D715, D717, D722)[3]

On March 4, 2020, Plaintiff sent an email to Giglio and Cory Nourie, the director of Community Services for DDDS, complaining that Whitehouse had been "tasked with documenting on her immediate supervisor, MaryCarol Beard, and me for months." (D.I. 114 at

---

[3] Plaintiff provides no substantive challenge or evidence contradicting the facts set forth in this paragraph of the Memorandum Opinion, which are alleged in Defendants' concise statement of facts. (D.I. 102 at ¶¶ 20-24) Instead, Plaintiff indicates the allegations are unsupported by citations to exhibits. (D.I. 106 at ¶¶ 20-22, 24) Plaintiff's assertion is inaccurate. These allegations are supported by citations to specific Bates numbers in the exhibits to Marissa Catalon's deposition. (D.I. 102 at ¶¶ 20-24)

¶ 8; D.I. 95, Ex. D at 8:24-9:1; Ex. F, Giglio-1 at D593-94)  According to Plaintiff, Whitehouse complained that the task force had been receiving "what could be described as manipulated data that does not reflect actual PROBIS outcomes." (*Id.*)  However, Plaintiff conceded that she had not heard Whitehouse herself use the term "manipulated data," and Whitehouse denied that the task force was being presented with manipulated PROBIS data.  (D.I. 95, Ex. B at 31:3-32:13; Ex. C at 44:17-46:12)  In the email, Plaintiff indicated she and Beard were unable "to conduct BSP reviews that result in ethically and clinically sound outcomes" and, as a result, they would not continue to chair PROBIS.  (*Id.*, Ex. F, Giglio-1 at D593-94)

After Plaintiff sent the March 4, 2020 email indicating her intention to step down from chairing PROBIS, Nourie, Catalon, and Giglio discussed next steps and planned a meeting to inform Plaintiff "that chairing PROBIS is an assigned job duty" and she "cannot decide to resign from that specific duty." (D.I. 95, Ex. F, Giglio-1 at D592; Ex. D at 58:5-7)  Following the meeting with Plaintiff on March 9, 2020, Giglio met with Catalon and Nourie to consider other positions Plaintiff could fill within DDDS.  (*Id.* Ex. F at 81:4-18 & Giglio-2 at D611; Ex. D at 58:5-11, 59:8-15)  They determined that Plaintiff could work in Applicant Services.  (*Id.*, Ex. D at 59:13-60:16)  MaryCarol Beard remained on the PROBIS committee after Plaintiff was transferred.  (*Id.*, Ex. J at 47:10-48:8)

Plaintiff was transferred to the new position in Applicant Services on April 26, 2020, where she began reporting to Lynda Lord.  (D.I. 95; Ex. K at 5:20-23)  Lord met with Plaintiff on April 27, April 29, and May 1, 2020 to establish an interim performance plan.  (D.I. 95, Ex. K at D1123-28, D1157-58, D1162-64)  Plaintiff's main assignments were: "(1) ensuring data on eligible applicants for DDDS services was up-to-date and entered into the Spreadsheet for Eligible Recipients . . ., including chart reviews, and, after becoming licensed, (2) performing

4

adaptive assessments of recipients." (D.I. 114 at ¶ 10; D.I. 95, Ex. K at D1124, D1128) Plaintiff confirmed in her deposition that she was tasked with verifying information for people who applied for and were accepted to receive DDDS services. (D.I. 95, Ex. B at 26:22-27:12, 28:18-22) Plaintiff objected to performing adaptive assessments and claimed that other DDDS employees had refused to complete the same tasks assigned to her in Applicant Services. (*Id.*, Ex. K at D1128; Ex. Q at 383:13-386:14; D.I. 106 at ¶ 28; D.I. 110 at ¶ 32) Plaintiff does not cite corroborating evidence of complaints by other DDDS employees regarding these tasks. (D.I. 106 at ¶ 28; D.I. 110 at ¶ 32)

On May 6, 2020, Lord sought Plaintiff's signature on a revised version of the interim performance plan containing each side's comments. (D.I. 95, Ex. K at D1159-60) There is no evidence of record that Plaintiff signed any version of the interim performance plan. (*Id.*, Ex. K at D1169-82, D1183-85) On May 7, 2020, Plaintiff filed a grievance regarding her transfer to Applicant Services and sent a copy to Lord. (*Id.*, Ex. K, DL-13 at D1165-67)

Because Plaintiff did not have a Delaware psychologist license at the time of her transfer, John Brady of the Labor Relations Unit sent a memo to Plaintiff asking her to "clear up any misunderstanding about your qualifications," noting that "[f]ailure to comply may lead to termination of your position with the State of Delaware for failure to meet the requirements of your position." (D.I. 114 at ¶ 11; D.I. 114-1; D.I. 95, Ex. B at 201:13-202:15; Ex. F at Giglio-4) Plaintiff testified that she did not need a psychologist license to administer adaptive assessments in her new position. (D.I. 95, Ex. Q at 409:16-415:8) Plaintiff acquired her Delaware psychologist license in the fall of 2020. (*Id.*, Ex. Q at 428:2-8; Ex. L)

At the time Plaintiff was transferred to Applicant Services, she was subject to a teleworking agreement. (D.I. 95, Ex. K at D1268) Communications between Plaintiff and Lord

following Plaintiff's transfer indicate that Plaintiff was often unresponsive to Lord's instructions and failed to timely complete assigned tasks. (*Id.*, Ex. K, DL-19 at D1248, DL-21 at 1244-47, DL-23 at D1221-22, DL-25 at D1255-59) Consequently, Lord advised Plaintiff that her telecommuting agreement was ending on June 7, 2021, after which Plaintiff was required report to the Fox Run office. (*Id.*, Ex. J2 at D1223; D.I. 114 at ¶ 19) Plaintiff refused to return to the office and instead took a week of annual leave in response to Catalon's subsequent directive to return to the office by July 26, 2021. (D.I. 95, Ex. J2 at D1223; Ex. K at D1217, D1260-61) During her two years in Applicant Services, Plaintiff reported for work at the Fox Run office on only two occasions: August 2 and 3, 2021. (D.I. 95, Ex. K, DL-26 at D1260)

Between August 10 and October 22, 2021, Plaintiff was on an approved leave of absence under the Family and Medical Leave Act ("FMLA"). (D.I. 95, Ex. K at D1224-26; Ex. N) Plaintiff was on unapproved leave beginning on October 23, 2021, and she was directed to return to work by November 12, 2021 or face termination of her employment. (D.I. 95, Ex. K at D1225-26) Plaintiff did not return to work on that date, and Lord recommended Plaintiff's dismissal "because of [Plaintiff's] continued absence and unavailability for work." (*Id.*, Ex. K at D1207-08) Plaintiff exercised her right to a pre-termination meeting, during which she explained that she was awaiting documentation from her medical provider to support her request for an accommodation. (*Id.*, Ex. N at D1211-12) As of May 2, 2022, Plaintiff had not submitted any documentation to support her continued absence or her request to work remotely, and she was again recommended for termination. (*Id.*) Plaintiff requested another pre-termination meeting but failed to attend the meeting scheduled for June 9, 2022. (*Id.*, Ex. T at D1215-16) Plaintiff received notice of her termination by letter dated June 23, 2022. (*Id.*; D.I. 110 at ¶ 40)

Plaintiff filed the instant action on October 22, 2021 after receiving a right to sue letter from the Equal Employment Opportunity Commission ("EEOC") on July 27, 2021. (D.I. 31 at ¶¶ 9-10, Ex. 1; D.I. 1; D.I. 106 at ¶ 25) Plaintiff's second amended complaint asserts two causes of action: (1) a First Amendment retaliation claim against the Individual Defendants under 42 U.S.C. § 1983; and (2) a claim for retaliation under Title VII. (D.I. 31 at ¶¶ 61-73) In the second amended complaint, Plaintiff contends that she was terminated from her employment with DDDS in retaliation for three forms of protected activity under the First Amendment and/or Title VII: (1) her complaints about the alleged manipulation of PROBIS data; (2) her complaints about DDDS's alleged fraudulent commingling of funds belonging to service recipients from DDDS;[4] and (3) her advocacy on behalf of two DDDS employees to receive increased compensation. (D.I. 31)

The facts regarding the alleged manipulation of PROBIS data are described above. Plaintiff also contends that DDDS engaged in the fraudulent commingling of funds belonging to recipients of DDDS services to conceal their financial resources from Medicaid and Social Security. (D.I. 106 at ¶ 7; D.I. 105, Ex. C at 332:6-19) Plaintiff maintains that she learned about the alleged comingling of funds from comments made by others during senior leadership meetings in 2018 and 2019, and through discussions with unidentified support coordinators.

---

[4] Plaintiff never clearly describes what funds were allegedly commingled in her second amended complaint. (D.I. 31 at ¶ 35) Plaintiff's answering brief on summary judgment states that the commingling of funds "is fraudulent because it conceals the financial resources of DDDS Service Recipients from Medicaid and Social Security," without identifying the origin of the allegedly concealed funds. (D.I. 105 at 9) In her deposition, she testified that "the service recipients had their—their funds, their money, all in—or the Division was storing all of their money in one account." (D.I. 95, Ex. B at 160:8-13) When counsel asked her if this was "in reference to DDDS being a payee for receipt of Medicaid funds," Plaintiff responded, "I'm not sure what you're referring to." (*Id.*, Ex. B at 160:19-23) Later, Plaintiff testified that "the service recipient's money was not being properly managed. And great efforts were taken to conceal this fact from Medicaid and Social Security." (*Id.*, Ex. B at 177:16-19)

(D.I. 105, Ex. C at 334:7-345:1)  However, Catalon, Nourie, and Giglio testified that they were

not aware of Plaintiff's allegations regarding commingled funds.  (D.I. 95, Ex. D at 44:25-45:6,

48:18-49:2; Ex. F at 103:14-21; Ex. J at 27:19-22)  During her deposition, Plaintiff was unable to

recall specifics or pinpoint the impropriety of the conduct, and she testified that she never saw

accounts with comingled funds because the management of the accounts "did not have anything

to do with [her] role."  (*Id.*, Ex. C at 340:18-22; D.I. 95, Ex. B at 160:6-181:8)

With respect to her Title VII retaliation claim at Count II of the second amended

complaint, Plaintiff contends that the adverse employment actions taken against her were the

result of the charge of discrimination she filed with the EEOC on December 9, 2020 and her

advocacy on behalf of two DDDS employees who claimed discrimination based on their race.

(D.I. 31 at ¶¶ 62, 72; D.I. 105 at 14-19)  As Director of Clinical Supports and co-chair of

PROBIS, Plaintiff supervised Robin Baynard, a DDDS behavioral analyst ("BA"), and Sharon

Bertin, a nursing supervisor.  (D.I. 102 at ¶ 13; D.I. 106 at ¶ 13; D.I. 95, Ex. B at 15:6-13)

Plaintiff advocated for Baynard to be reclassified as a senior BA at the recommendation of

Baynard's supervisor, Karen Blakely.  (D.I. 102 at ¶ 14; D.I. 106 at ¶ 14; D.I. 95, Ex. Q at 510:2-

13; Ex. F at 106:22-107:11)  Baynard's complaints about her pay were resolved when a position

opened for a senior BA and Baynard applied for the position.  (D.I. 102 at ¶ 15; D.I. 106 at ¶ 15;

D.I. 95, Ex. F at 107:12-108:2)

Plaintiff advocated for Bertin to receive increased pay after she assumed the duties of the

nurse supervisor for Kent and Sussex Counties due to a vacancy in those counties in addition to

her role as nurse supervisor for New Castle County.  (D.I. 102 at ¶ 16; D.I. 106 at ¶ 16; D.I. 95,

Ex. G at 10:17-11:8)  On January 7, 2020, Giglio and Catalon met with Bertin to discuss her

concerns regarding her workload and her view that she was working outside of her job

8

classification.  Giglio and Catalon disagreed with Bertin that she was working outside her job classification.  (D.I. 102 at ¶ 17; D.I. 106 at ¶ 17; D.I. 95, Ex. H at 20:9-16 & DKG-8)  From January through March of 2020, Giglio and Nourie corresponded with Bertin and Plaintiff to discuss the terms of an acceptable, updated performance plan for Bertin.  (D.I. 102 at ¶ 18; D.I. 106 at ¶ 18; D.I. 95, Ex. G at Bertin-3 to Bertin-6)

On April 3, 2020, Bertin filed a grievance regarding her compensation, and Plaintiff continued to support Bertin throughout the grievance process.  (D.I. 95, Ex. G at 20:4-19, Ex. Bertin-1)  On September 22, 2020, Plaintiff was a witness during Bertin's Step 3 grievance hearing.  (D.I. 95, Ex. J1, Catalon-5 at 2)  On May 9, 2021, Bertin's salary was increased from $56,699.36 to $68,500.  (D.I. 102 at ¶ 19; D.I. 106 at ¶ 19; D.I. 95, Ex. G at Ex. Bertin-2)  A hearing on Bertin's grievance was held on August 19, 2021.  (D.I. 95, Ex. A1 at 15:6-10; Ex. G at 18:8-15; Ex. I)  Plaintiff was not listed among the testifying witnesses at Bertin's grievance hearing.  (*Id.*, Ex. I at 2)  Bertin ultimately prevailed on her grievance in a decision issued by the Merit Employee Relations Board on September 23, 2021.  (D.I. 95, Ex. G at 37:11-23; Ex. I)

Plaintiff's own grievance filed on May 7, 2020 resulted in an August 11, 2021 written decision from the Merit Employee Relations Board ("MERB") unanimously dismissing the grievance.  The MERB concluded that Plaintiff's transfer to Applicant Services was not a demotion and was not done in retaliation for Plaintiff's speech regarding PROBIS practices.  (D.I. 95, Ex. M at D1110-11)  The MERB further concluded that Plaintiff's advocacy for her direct reports and her statements regarding alleged data manipulation at PROBIS were not protected speech because they were made in the course of her official duties.  (*Id.*)

In this case, the parties have submitted multiple requests for extensions to the fact discovery deadline and the deadline for case dispositive motions.  (D.I. 20; D.I. 31; D.I. 75; D.I.

81; D.I. 85; D.I. 87; D.I. 89; D.I. 104; D.I. 109; D.I. 112)  Following the completion of briefing on Defendants' motion for summary judgment, the parties agreed to engage in mediation.  (D.I. 116)  As a result, the pretrial conference and trial dates were vacated.  (D.I. 117)  The parties were unable to reach a settlement agreement during or after the mediation.  (D.I. 126)  A pretrial conference is currently set for January 8, 2026, and a jury trial is set to begin on January 26, 2026.  (D.I. 121)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact.  *See Celotex*, 477 U.S. at 322.  The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989).  A non-moving party asserting that a fact is genuinely disputed must support the assertion by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials," or by "showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "[C]onclusory allegations . . . in the absence of

particulars[ ] are insufficient to defeat summary judgment." *Taylor v. Cherry Hill Bd. of Educ.*,

85 F. App'x 836, 839 (3d Cir. 2004).

When determining whether a genuine issue of material fact exists, the court must view

the evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However,

there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party[.]" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the

facts for purposes of ruling on a motion for summary judgment." *Id.* If the non-moving party

fails to make a sufficient showing on an essential element of its case, the moving party is entitled

to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

## III.    DISCUSSION

Before reaching the substance of Plaintiff's causes of action, the court addresses the

parties' dispute regarding the Declaration of Dominique Lawson (the "Lawson Declaration"),

which was submitted by Defendants in support of their motion for summary judgment. (D.I. 98)

Plaintiff asks the court to preclude Defendants from relying on the Lawson Declaration and the

associated exhibits because Defendants disclosed Lawson and her opinions for the first time in

their motion for summary judgment, depriving Plaintiff of the opportunity to rebut Lawson's

opinion, challenge the credibility and reliability of the opinion under the *Daubert* standard, or adequately prepare for cross-examination. (D.I. 105 at 4-7)

Defendants describe Lawson as a fact witness possessing personal knowledge based on her work as a state employee, and her testimony will assist the court "in determining a 'fact in issue' – whether DDDS was committing financial fraud." (D.I. 113 at 1-2) Although they acknowledge that Lawson was not timely disclosed, Defendants contend that the failure to disclose her as a fact witness was harmless. (*Id.*)

The issue of whether DDDS actually committed financial fraud has no bearing on the retaliation claims at issue in this litigation. Rather, Plaintiff must establish that she made a complaint and Defendants retaliated against her for making that complaint. "When a plaintiff engages in protected activity, the merits of their underlying complaint against the employer are irrelevant[.]" *DiPrato v. Bernstiel*, 2022 WL 206183, at * (M.D. Pa. Jan. 24, 2022); *see Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 (3d Cir. 2002) ("[I]t does not matter whether the factual basis for the employer's discriminatory animus was correct and that, so long as the employer's specific intent was discriminatory, the retaliation is actionable."). Because the merits of Plaintiff's fraud allegations against DDDS and the intricacies of DDDS's representative payee obligations are of no moment to the present dispute, the court does not consider the Lawson declaration in its resolution of the pending motion for summary judgment. Plaintiff's request for relief pertaining to the declaration is therefore moot.

## A. Count I: First Amendment Retaliation

Count I of the operative pleading asserts a cause of action for First Amendment retaliation under 42 U.S.C. § 1983 "against DSSS. [*sic*] Lynda Lord and Kamin Giglio, Catalon, and Nourie." (D.I. 31 at 11) Defendants contend that DDDS is immune from suit for First

Amendment retaliation under the doctrine of sovereign immunity. (D.I. 101 at 4 n.4) Plaintiff offers no response to this argument. (D.I. 105) There is no dispute that DDDS is a state agency. (D.I. 31 at ¶ 2) In the absence of any showing by Plaintiff that an exception to Eleventh Amendment immunity applies, Defendants' motion for summary judgment is GRANTED as to the First Amendment retaliation claim against DDDS. *See Alston v. Admin. Offices of Del. Courts*, 663 F. App'x 105, 108 (3d Cir. 2016) ("Congress did not abrogate the states' Eleventh Amendment immunity when it enacted 42 U.S.C. § 1983.").

Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim is also GRANTED as it pertains to the Individual Defendants. "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990). Proof of a retaliation claim requires Plaintiff to demonstrate that: (1) she engaged in protected activity; (2) she was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002) (citing *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If Plaintiff establishes that she engaged in protected activity and her speech was a substantial or motivating factor in Defendants' retaliatory action, the burden shifts to the Individual Defendants to show they would have taken the same action even if the speech had not occurred. *See Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).

Here, Defendants argue that Plaintiff failed to produce evidence satisfying the first and third elements of her First Amendment retaliation claim. (D.I. 101 at 4-17) Under the first element, a public employee's statement is protected by the First Amendment when, "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern,

and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' " as a result of her statement. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir 2006) (citing *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006)).  Neither category of Plaintiff's alleged protected speech satisfies these requirements.

There is no evidence on the present record that Plaintiff complained about the alleged commingling of funds.  Plaintiff cites only her own declaration and testimony regarding this issue, but she was unable to recall specifics or pinpoint the impropriety of the conduct during her deposition, and she testified that she "never ha[d] the occasion to see accounts for this money." (D.I. 95, Ex. R at 524:1-525:17, 522:18-523:13; Ex. B at 160:6-181:8)  Catalon, Nourie, and Giglio testified that they were not aware of Plaintiff's allegations regarding commingled funds, and no other evidence of record supports Plaintiff's assertion that she engaged in protected conduct by raising a complaint about the commingling of funds.  (D.I. 95, Ex. D at 44:25-45:6, 48:18-49:2; Ex. F at 103:14-21; Ex. J at 27:19-22)

The record supports Plaintiff's assertion that she reported the alleged manipulation of data on PROBIS outcomes in an email on March 4, 2020, which stated that "[a]nother assertion from [Whitehouse] is that the Task Force is receiving what could be described as manipulated data that does not reflect actual PROBIS outcomes." (*Id.*, Ex. F, Giglio-1 at D593)  However, Plaintiff's complaint falls within the scope of her official duties on the PROBIS committee and was not made in her role as a citizen, as confirmed by her testimony that "PROBIS outcomes are about the behavior support plans and the status of the plans[.]" (*Id.*, Ex. B at 44:7-22) Consistent with Plaintiff's testimony, the Merit Employee Relations Board ("MERB") determined that Plaintiff's "statements to management about her belief that there was data

14

manipulation at PROBIS . . . were not protected speech because they were made in the course of her official duties." (*Id.*, Ex. M at D1111)

The connection between data on PROBIS outcomes and Plaintiff's official duties is further supported by documentary evidence. The Task Force reports showing the PROBIS data set forth the number of outstanding BSPs, the reasons why those BSPs remain outstanding, and the number of approved BSPs, among other information. (*Id.*, Ex. J2 at D708, D712-13, D717, D722) Email correspondence from Plaintiff in 2019 confirms that Plaintiff reported on the number of late and approved BSPs as part of her official duties. (*Id.*, Ex. J2 at D571-72) Viewed collectively, this evidence indicates Plaintiff's speech regarding the manipulation of data on PROBIS outcomes was not made as a public citizen, but rather as a public employee speaking pursuant to her official duties. *See Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 653 (3d Cir. 2018) (holding that the plaintiff was speaking pursuant to her official duties as a public employee, and not as a citizen, by critically evaluating the budget).

Plaintiff's allegation regarding the manipulation of PROBIS data otherwise lacks specifics and is based on Plaintiff's assertion that MaryCarol Beard said Whitehouse told her that PROBIS data was being manipulated before presentation to the Task Force. (*Id.*, Ex. B at 31:3-35:2; Ex. Q at 308:22-309:22, 316:2-22, 318:2-10) There is no testimony from Beard to corroborate this assertion, and Whitehouse denied being told to manipulate PROBIS data by Giglio. Instead, Whitehouse stated "I believe that [Plaintiff] and MaryCarol were the ones who were asking me to manipulate the data that was provided to [Giglio]." (*Id.*, Ex. C at 21:10-22:25, 99:5-100:1) Giglio also testified that she was unaware of Plaintiff's complaint until Plaintiff's March 4, 2020 email, and she was not aware of any complaints by Whitehouse regarding manipulated PROBIS data. (*Id.*, Ex. F at 51:2-52:8)

15

Even if the court were to determine that Plaintiff's reports of data manipulation and commingling of federal funds constitute protected speech unrelated to her official duties, the evidence of record does not plausibly establish that Plaintiff's speech was a substantial or motivating factor in the Individual Defendants' decision to transfer or terminate her.[5]  To prove that protected speech is a substantial or motivating factor in the alleged retaliatory action under the third prong, a plaintiff must show: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing.  *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361-62 (3d Cir. 2021).  "In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of fact should infer causation."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (internal quotation marks and citations omitted).  Once the plaintiff satisfies this initial burden, the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct."  *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  "If the employer shows that it would have taken the same action even absent the protected conduct, this will 'defeat plaintiff's claim.' "  *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000) (quoting *Green v. Phila. Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997)).

Here, Plaintiff cites the temporal proximity between her email reporting the alleged manipulation of PROBIS data, her transfer to Applicant Services, and the threat of termination

---

[5] Count I of Plaintiff's second amended complaint for First Amendment retaliation also alleges that "Plaintiff engaged in the protected activity of participating and supporting state employees who were facing racial discrimination."  (D.I. 31 at ¶ 62; *see also* D.I. 95, Ex. A2 at 19:5-12) However, Plaintiff does not identify her advocacy on behalf of Baynard and Bertin as protected speech in support of her First Amendment retaliation claim in the briefing on summary judgment.  (D.I. 105 at 7-10)

she faced following her transfer. (D.I. 105 at 11-12)  There is no dispute that Plaintiff was

transferred on April 26, 2020, nearly two months after she sent the March 4, 2020 email stating

she would not continue to chair PROBIS. (D.I. 102 at ¶ 28; D.I. 106 at ¶ 6; D.I. 95, Ex. K at

5:20-23 & DL-2 at D1123-24)  Moreover, Plaintiff was not terminated until June 23, 2022, more

than two years after the protected activity. (D.I. 95, Ex. T at D1215-16)  Generally, an allegedly

retaliatory action must occur "within days" of the protected activity to establish an unusually

suggestive temporal proximity for purposes of causation. *See Starnes v. Butler Cnty. Ct. of

Common Pleas*, 971 F.3d 416, 430 (3d Cir. 2020); *see also Yu v. U.S. Dep't of Veterans Affairs*,

528 F. App'x 181, 185 (3d Cir. 2013) (describing temporal proximity as "unusually suggestive"

when the alleged retaliation occurs "within a few days but no longer than a month.").

Because Plaintiff has not established an unusually suggestive temporal proximity

between the protected activity and the allegedly retaliatory action, the court next considers

"timing plus other evidence" and evidence of the record as a whole. *Farrell v. Planters

Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).  Plaintiff does not expressly refer to a "pattern

of antagonism" in her answering brief, but she alludes to poor treatment by Lord following her

transfer and notes that Beard was not transferred despite sharing the same concerns as Plaintiff

about her PROBIS duties. (D.I. 105 at 12-13)  The evidence cited by Plaintiff in support of these

allegations is largely limited to her own declaration and deposition testimony. (*Id.*)  From this

evidence, it appears that the key facts are not in dispute.  The balance of Plaintiff's testimony

consists of speculative and conclusory assertions regarding why she was transferred and

terminated.  These assertions are insufficient to create a genuine issue of material fact supporting

Plaintiff's claim that her protected speech was a substantial or motivating factor in her transfer

and/or termination. *See Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011)

(concluding that "self-serving deposition testimony is insufficient to raise a genuine issue of material fact."); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment. Inferences must flow directly from admissible evidence." (internal citations and quotation marks omitted)).

Plaintiff's contention that her protected speech was a substantial or motivating factor in her transfer to Applicant Services is unsupported. Plaintiff claims that Beard received more favorable treatment because she was not transferred after Plaintiff sent the March 4, 2020 email. (D.I. 105 at 12) But there is no testimony or other evidence from Beard corroborating Plaintiff's assertion that Beard joined Plaintiff's request to be removed from PROBIS, and testimony from other witnesses contradicts Plaintiff's claim. (*See, e.g.*, D.I. 95, Ex. J at 47:10-48:8)

Plaintiff's allegations of poor treatment by Lord include the assignment of tasks Plaintiff considered to be illegal or ill-advised and Lord's denial of Plaintiff's request to use sick leave or work from home after her FMLA leave expired. (D.I. 105 at 12-13) Plaintiff cites excerpts of Catalon's deposition, but these excerpts do not support Plaintiff's allegations. (*Id.*) Catalon testified that Plaintiff's concerns about the illegality of her assigned tasks were considered and were determined to be unsubstantiated, Plaintiff was recommended for termination because she did not report to work, and Plaintiff's request to telework was denied because there were documented concerns that Plaintiff was not completing her tasks. (D.I. 95, Ex. J at 76:8-78:22)

Catalon's testimony is corroborated by other evidence, including Plaintiff's own deposition testimony and contemporaneous email communications between Plaintiff and Lord. Plaintiff testified that she had reservations about performing adaptive assessments because she did not believe those assessments should be administered in isolation, and others tasked with

18

performing these assessments had also resisted.  (D.I. 95, Ex. Q at 383:13-384:20)  There is no other evidence supporting Plaintiff's testimony that other individuals declined to perform adaptive assessments in isolation.  Plaintiff contends that Dr. Troy Lea objected to performing adaptive assessments, but Plaintiff cites no testimony or other evidence from Dr. Lea on this record confirming her representation.  (*Id.*, Ex. Q at 387:8-390:5)  In contrast, communications from Lord in April of 2021 indicate that other psychologists working with DDDS routinely performed adaptive assessments in under two hours.  (*Id.*, Ex. K, DL-25 at D1255-57)  Plaintiff conceded that she never suggested administering complete assessments to resolve her concerns about performing adaptive assessments in isolation.  (*Id.*, Ex. Q at 394:9-18)  Emails between Lord and Plaintiff confirm that Plaintiff did not perform assigned adaptive assessments despite repeated requests and instruction.  (*Id.*, Ex. K, DL-25 at D1255-59)

Plaintiff's own testimony also supports Defendants' position that she failed to perform the "data entry" portion of her post-transfer duties, which Plaintiff characterized as "not difficult."  (D.I. 95, Ex. B at 26:8-28:2)  When Lord confronted Plaintiff about her failure to complete her chart reviews in a timely manner, Plaintiff responded that the charts were onerous to review.  (*Id.*, Ex. Q at 279:6-284:19)  However, Plaintiff could not recall how long those reviews took to complete or how much of her assigned work she was able to complete.  (*Id.*)  Emails between Lord and Plaintiff confirm that Lord repeatedly asked Plaintiff to update the spreadsheet data to reflect Plaintiff's chart reviews, and Plaintiff either did not respond or asked for further extensions.  (*Id.*, Ex. K, DL-21 at D1244-47, DL-23 at D1221-22)  In sum, there is no evidence indicating that Plaintiff completed her assigned tasks during her time in Applicant Services.

Plaintiff's challenge to the limitations placed on her ability to work remotely and use sick leave after exhausting her FMLA leave is also unsupported by the evidence of record. Plaintiff refers to a "similar employee," Heather Courtney, who was allegedly treated more favorably because she was allowed to work from home and use her sick days after her FMLA leave expired. (D.I. 105 at 13) But Plaintiff does not substantiate these allegations with corroborating evidence establishing the basic facts and circumstances of Courtney's FMLA status or requests for accommodation. *See Thomas v. Del. State Univ.*, C.A. No. 10-522-GMS, 2014 WL 5020275, at *5 (D. Del. Oct. 6, 2014) (granting summary judgment on First Amendment retaliation claim and rejecting the plaintiff's testimony regarding a pattern of antagonism that was unsupported by the testimony of other witnesses to the alleged conduct). Plaintiff's testimony that Sharon Bertin told her about Courtney's treatment confirms that Plaintiff has no direct evidence of this alleged comparator, and Bertin's deposition transcript is silent as to Courtney. (D.I. 95, Ex. G; Ex. R at 548:13-550:9) Contemporaneous communications support Defendants' position that Plaintiff's telework privileges were terminated due to her unresponsiveness and failure to complete her assigned tasks. (D.I. 95, Ex. K at 51:6-54:6; DL-24 at D1217, DL-26 at D1260-61) Even when Plaintiff was instructed to return to the office, she refused to do so. (*Id.*, Ex. K at 51:6-9, DL-22 at D1219-20) Ultimately, the record indicates that Plaintiff reported to her physical office on only two occasions, August 2 and 3, 2021, during more than two years of employment with Applicant Services. (*Id.*, Ex. K at 51:6-54:6; DL-24 at D1217, DL-26 at D1260-61)

Without citing to any evidence, Plaintiff claims she was terminated in the middle of her ADA approval process. (D.I. 105 at 13) A review of the record contradicts Plaintiff's unsupported claim. Correspondence shows that Plaintiff was advised her leave was unauthorized as of October 23, 2021 and she did not return to work by the deadline of November 15, 2021.

(D.I. 95, Ex. K, DL-28 at D1225-26; DL-29 at 1207-08)  At her pre-termination hearing, however, Plaintiff indicated that she was awaiting documentation from her medical provider to support her accommodation request.  (*Id.*, Ex. N)  Approximately six months later, Plaintiff still had not produced documentation supporting her accommodation request, prompting another recommendation for termination.  (*Id.*)  Plaintiff was terminated only after she did not appear for her second pre-termination hearing on June 9, 2022.  (*Id.*, Ex. T)

Even if the court were to determine that Plaintiff satisfied her burden on causation, the Individual Defendants have shown that Plaintiff would have been transferred or terminated in the absence of the protected speech.  The evidence supports the Individual Defendants' position that Plaintiff was transferred to Applicant Services to accommodate her own request to step down as co-chair of PROBIS while maintaining her position, classification, and paygrade within DDDS.  (*Id.*; Ex. M at D1110)  The March 4, 2020 email from Plaintiff states that, "[a]t this time, we do not believe that we have the support of the Division and will not continue to chair PROBIS.  The Division will need to select alternative designees to chair meetings scheduled for March 11, 2020 and beyond." (D.I. 95, Ex. F, Giglio-1 at D593)  Plaintiff confirmed her refusal to fulfill her PROBIS responsibilities in her deposition, testifying that "[w]e said we will not continue to chair PROBIS." (*Id.*, Ex. B at 114:11-12)  Plaintiff was informed that she could not step down as co-chair of PROBIS because it was an assigned duty and, "absent that duty, there would be very little work for [Plaintiff] to do to support the daily operations of Community Services."  (*Id.*, Ex. F, Giglio-7 at D1088)  The deliberations of the Individual Defendants confirm that their decision to transfer Plaintiff was based on her decision not to chair PROBIS anymore.  (*Id.*, Ex. F at 81:1-83:3, 94:10-95:13, 97:9-98:20; Ex. D at 58:5-11; 76:1-6)  The Individual Defendants have also met their burden to show that Plaintiff would have been terminated absent the protected speech

due to her failure to complete her assigned work or respond to her supervisor after her transfer to
Applicant Services, as described *supra*.

Viewing the evidence of record as a whole, the court concludes there is no genuine issue
of material fact. Rather, the undisputed evidence demonstrates that Plaintiff's transfer to
Applicant Services resulted from her own request to stop co-chairing PROBIS, and her ultimate
termination was due to her failure to complete her assigned work or respond to her supervisor.
Plaintiff's own testimony confirms that she demanded to step down from PROBIS and did not
complete assigned tasks following her transfer. On this record, no reasonable jury could find
a causal connection between Plaintiff's transfer and termination and her reports of financial fraud
and/or manipulation of PROBIS data. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 113–
14 (3d Cir. 2003) (affirming grant of summary judgment on First Amendment retaliation claim
where, "in the context of the record as a whole, the chronology of events does not provide
substantial support for [the plaintiff's] position.").

### B. Count II: Retaliation under Title VII[6]

Plaintiff's Title VII retaliation claim is subject to analysis under the burden-shifting
framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under this
framework, Plaintiff must first make out a *prima facie* case of retaliation by showing: (1) she

---

[6] In a footnote, Defendants contend that the Individual Defendants should be dismissed as a
matter of law because they were sued in their individual capacities, and Title VII does not apply
to employees in their individual capacities. (D.I. 101 at 17 n.18) Plaintiff does not address this
argument in her answering brief, and Defendants do not pursue the issue further in their reply
brief. (D.I. 105 at 14-19; D.I. 113) The operative pleading does not specify whether Count II is
brought against all Defendants or only DDDS. (D.I. 31 at ¶¶ 70-73) It is well-established that
liability under Title VII extends only to employers, and not to supervisors or other employees.
*See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) ("We are
persuaded that Congress did not intend to hold individual employees liable under Title VII.").
To the extent Plaintiff seeks to assert her Title VII retaliation claim against the Individual
Defendants, Defendants' motion for summary judgment is GRANTED.

engaged in protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). Once Plaintiff establishes a *prima facie* case, the burden shifts to DDDS to articulate a "legitimate, non-retaliatory reason for having taken the adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193-94 (3d Cir. 2015). Plaintiff must then present evidence showing that DDDS's reasons are pretext for a retaliatory motive. *Id.*

Defendants focus their argument on the lack of a causal connection between Plaintiff's protected activity and the adverse employment actions for purposes of Plaintiff's Title VII retaliation claim. (D.I. 101 at 18) Plaintiff contends that she engaged in protected activity by advocating on behalf of Bertin and Bayard, who complained of being undercompensated. (D.I. 31 at ¶¶ 18-32; D.I. 105 at 16) Plaintiff also identifies her own EEOC charge of discrimination filed on December 9, 2020 and the original complaint filed in this action on October 22, 2021 as protected conduct. (D.I. 105 at 15) As a result of her engagement in these protected activities, Plaintiff alleges that she suffered adverse employment actions in the form of her transfer to Applicant Services in April of 2020 and her ultimate termination in June of 2022. (*Id.* at 15-16) Plaintiff also cites the denial of her requests to telework and use sick days after her FMLA leave expired. (*Id.* at 17-18)

To establish causation, Plaintiff again focuses on the temporal proximity of her protected activity and the adverse events. (D.I. 105 at 14-15) However, the temporal proximity between the protected activities and the adverse actions is not unduly suggestive in this case. *See Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187-89 & n.30 (3d Cir. 2019) (concluding that two months between protected activity and adverse action was not unduly

23

suggestive of retaliation); *Dolan v. Venn Millers Ins. Co.*, 625 F. App'x 91, 94 (3d Cir. 2015) (concluding that proximity of three months was not "unusually suggestive" to establish a causal connection). Plaintiff has not proffered evidence of when she advocated on behalf of Baynard, nor does she provide dates for the denial of her telework and sick leave requests or the termination of her medical benefits. (D.I. 105 at 16-17) Plaintiff's transfer to Applicant Services in April of 2020 predated her testimony at Bertin's grievance hearing on September 22, 2020, the filing of her own charge of discrimination on December 9, 2020, and the initiation of this civil action on October 22, 2021. (D.I. 95, Ex. J1, Catalon-5 at 2; D.I. 1) Consequently, her transfer could not be causally related to her alleged protected activities. Each of these activities also occurred many months prior to her termination in June of 2022, negating Plaintiff's position regarding unduly suggestive temporal proximity. (D.I. 95, Ex. T); *see Peterson v. Wilkie*, C.A. No. 16-160-LPS, 2020 WL 6270801, at *7 (D. Del. Oct. 26, 2020), *aff'd sub nom. Peterson v. Sec'y United States Dep't of Veterans Affs.*, 2021 WL 2104497 (3d Cir. May 25, 2021).

Even if Plaintiff could establish unduly suggestive temporal proximity between her activities and the adverse employment actions, Defendants have articulated legitimate, non-retaliatory reasons for those adverse actions for the reasons discussed at § III.A, *supra*, and Plaintiff has not demonstrated that those reasons are pretextual. *See Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 537 (3d Cir. 2006) (explaining that the plaintiff's evidence of pretext "must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action"). Plaintiff refers to Heather Courtney as an alleged comparator who was treated more favorably, but she relies exclusively on her own deposition testimony for factual support. (D.I. 105 at 17-18) As previously discussed at § III.A, *supra*, Plaintiff's testimony

indicates her knowledge of Courtney's circumstances is derived from statements made by Bertin, as opposed to information obtained first-hand. (D.I. 95, Ex. R at 548:13-550:9) Moreover, Defendants correctly argue that "the record does not speak to the context of Ms. Courtney's use of sick days, the termination of her medical benefits, or who she is or how she was similarly situated" to Plaintiff. (D.I. 101 at 18)

As with the First Amendment retaliation claim, the evidence supporting Plaintiff's claim for retaliation under Title VII is largely limited to her own deposition testimony, which is not enough to create a genuine issue of material fact. Key factual information is missing from the testimony, the transcript is replete with conclusory and speculative assertions, and other portions of Plaintiff's testimony appear to corroborate Defendants' proffered reasons for transferring and terminating Plaintiff. Because Plaintiff has failed to put forward sufficient evidence of a causal connection between her protected activities and the adverse employment actions to meet her *prima facie* case under Title VII, Defendants' motion for summary judgment on the Title VII retaliation claim is GRANTED.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (D.I. 101) is GRANTED. An Order consistent with this Memorandum Opinion shall issue.